No. 15-1008

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

CORETEL VIRGINIA, LLC,

*Plaintiff-Appellant*,

v.

VERIZON VIRGINIA LLC, VERIZON SOUTH INC., MCIMETRO ACCESS
TRANSMISSION SERVICES LLC, MCI COMMUNICATIONS SERVICES
INC., VERIZON BUSINESS GLOBAL LLC, AND BELL ATLANTIC
COMMUNICATIONS INC. D/B/A VERIZON LONG DISTANCE,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court for the Eastern District of
Virginia, Alexandria Division, Case No. 1:12-cv-741

———————————

**BRIEF FOR THE VERIZON DEFENDANTS-APPELLEES**

———————————

Scott H. Angstreich
Eduardo F. Bruera
Kellogg, Huber, Hansen, Todd,
 Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (facsimile)

*Counsel for Defendants-Appellees*

April 3, 2015

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _15-1008_     Caption: _CoreTel Virginia, LLC v. Verizon Virginia, LLC_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Bell Atlantic Communications, Inc. n/k/a Verizon Long Distance LLC_____
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                          ☑ YES ☐ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:
        Verizon New York Inc.
        NYNEX LLC
        Verizon Communications Inc.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                             ☑ YES ☐ NO
        If yes, identify all such owners:
        Verizon Communications Inc.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Scott H. Angstreich                    Date:    04/03/2015

Counsel for: Verizon Virginia LLC, Verizon South Inc., MCImetro Access Transmission Services LLC, MCI Communications Services, Inc., Verizon Business Global LLC, and Bell Atlantic Communications, Inc. n/k/a Verizon Long Distance LLC

**CERTIFICATE OF SERVICE**
**************************

I certify that on    04/03/2015    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Edward J. Tolchin
8000 Towers Crescent Drive, #1450
Tysons Corner, VA 22182
etolchin@offitkurman.com

/s/ Scott H. Angstreich                                04/03/2015
(signature)                                                (date)

ii

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1008__    Caption: __CoreTel Virginia, LLC v. Verizon Virginia, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__MCI Communications Services, Inc.__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☑ YES ☐ NO
If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

MCI Broadband Solutions, Inc.; Terremark Worldwide, Inc.; Verizon Business Network Services Inc.; MCI Communications Corporation; Verizon Business Global LLC; Verizon Communications Inc.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☑ YES ☐ NO
If yes, identify all such owners:

Verizon Communications Inc.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
   If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Scott H. Angstreich                    Date:    04/03/2015

Counsel for: Verizon Virginia LLC, Verizon South Inc., MCImetro Access Transmission Services LLC, MCI Communications Services, Inc., Verizon Business Global LLC, and Bell Atlantic Communications, Inc. n/k/a Verizon Long Distance LLC

## CERTIFICATE OF SERVICE
*************************

I certify that on ____04/03/2015____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Edward J. Tolchin
8000 Towers Crescent Drive, #1450
Tysons Corner, VA 22182
etolchin@offitkurman.com

/s/ Scott H. Angstreich                         04/03/2015
        (signature)                               (date)

iv

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-1008__    Caption: __CoreTel Virginia, LLC v. Verizon Virginia, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__MCImetro Access Transmission Services LLC__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☑YES ☐NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
       Verizon Business Network Services Inc.
       MCI Communications Corporation
       Verizon Business Global LLC
       Verizon Communications Inc.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑YES ☐NO
       If yes, identify all such owners:
       Verizon Communications Inc.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Scott H. Angstreich_____    Date: _____04/03/2015_____

Counsel for: Verizon Virginia LLC, Verizon South Inc., MCImetro Access Transmission
Services LLC, MCI Communications Services, Inc., Verizon Business Global LLC, and
Bell Atlantic Communications, Inc. n/k/a Verizon Long Distance LLC

## CERTIFICATE OF SERVICE
**************************

I certify that on _____04/03/2015_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Edward J. Tolchin
8000 Towers Crescent Drive, #1450
Tysons Corner, VA 22182
etolchin@offitkurman.com

/s/ Scott H. Angstreich_____                    _____04/03/2015_____
        (signature)                                          (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1008__    Caption: __CoreTel Virginia, LLC v. Verizon Virginia, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Verizon Business Global LLC__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
        Verizon Communications Inc.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO
      If yes, identify all such owners:
        Verizon Communications Inc.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Scott H. Angstreich                  Date:        04/03/2015

Counsel for: Verizon Virginia LLC, Verizon South Inc., MCImetro Access Transmission Services LLC, MCI Communications Services, Inc., Verizon Business Global LLC, and Bell Atlantic Communications, Inc. n/k/a Verizon Long Distance LLC

## CERTIFICATE OF SERVICE
**************************

I certify that on        04/03/2015        the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Edward J. Tolchin
8000 Towers Crescent Drive, #1450
Tysons Comer, VA 22182
etolchin@offitkurman.com

/s/ Scott H. Angstreich                              04/03/2015
        (signature)                                          (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-1008__      Caption: _CoreTel Virginia, LLC v. Verizon Virginia, LLC_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Verizon South Inc._____
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                    ☑ YES ☐ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
         GTE Corporation
         NYNEX LLC
         Verizon Ventures LLC
         Verizon Communications Inc.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                         ☑ YES ☐ NO
        If yes, identify all such owners:
         Verizon Communications Inc.

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Scott H. Angstreich                          Date:      04/03/2015

Counsel for: Verizon Virginia LLC, Verizon South Inc., MCImetro Access Transmission Services LLC, MCI Communications Services, Inc., Verizon Business Global LLC, and Bell Atlantic Communications, Inc. n/k/a Verizon Long Distance LLC

## CERTIFICATE OF SERVICE

**************************

I certify that on _____04/03/2015_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Edward J. Tolchin
8000 Towers Crescent Drive, #1450
Tysons Corner, VA 22182
etolchin@offitkurman.com

/s/ Scott H. Angstreich                                     04/03/2015
          (signature)                                              (date)

x

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __15-1008__    Caption: __CoreTel Virginia, LLC v. Verizon Virginia, LLC_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Verizon Virginia LLC_____
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☑YES ☐NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
       Verizon Communications Inc.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                   ☑YES ☐NO
      If yes, identify all such owners:
       Verizon Communications Inc.

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Scott H. Angstreich                              Date:      04/03/2015

Counsel for: Verizon Virginia LLC, Verizon South Inc., MCImetro Access Transmission Services LLC, MCI Communications Services, Inc., Verizon Business Global LLC, and Bell Atlantic Communications, Inc. n/k/a Verizon Long Distance LLC

## CERTIFICATE OF SERVICE
*************************

I certify that on _____04/03/2015_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Edward J. Tolchin
8000 Towers Crescent Drive, #1450
Tysons Corner, VA 22182
etolchin@offitkurman.com

/s/ Scott H. Angstreich                                          04/03/2015
       (signature)                                                  (date)

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENTS .................................................... i

TABLE OF AUTHORITIES ........................................................................... xv

JURISDICTIONAL STATEMENT ................................................................... 1

STATEMENT OF THE ISSUES ....................................................................... 2

STATEMENT OF THE CASE .......................................................................... 3

      A.    Previous Proceedings .......................................................... 3

      B.    Remand Proceedings ........................................................... 6

      C.    The Trial ............................................................................... 7

      D.    The District Court's Order ................................................... 9

SUMMARY OF THE ARGUMENT ................................................................ 12

ARGUMENT .................................................................................................. 15

I.      STANDARD OF REVIEW .................................................................... 15

II.     THE DISTRICT COURT PROPERLY AWARDED VERIZON
       $366,698.69 IN DAMAGES ................................................................ 16

III.    THIS COURT'S REMAND ORDER REQUIRED THE DISTRICT
       COURT TO DETERMINE THE DAMAGES DUE TO VERIZON .......... 22

      A.    CoreTel Erroneously Conflates Its Liability for Breach of
           Contract with the Damages Sought for that Claim ............................ 23

      B.    CoreTel's Position is Inconsistent with the Mandate Rule ................ 26

      C.    CoreTel's Remaining Arguments Are Meritless ................................ 28

xiii

IV.    THE DISTRICT COURT CORRECTLY INCLUDED LATE
       PAYMENT CHARGES IN VERIZON'S DAMAGES ...............................29

       A.    The Plain Text of the Contracts Defeats CoreTel's Arguments .........30

       B.    CoreTel's Reliance Upon Virginia Law to Circumvent the
             Contracts' Terms Is Foreclosed by Circuit Precedent ......................32

       C.    CoreTel Cannot Use Amounts Due for Reciprocal
             Compensation To Reduce the Late Payment Charges It Owes ..........33

V.     CORETEL'S EFFORTS TO REDUCE ITS DAMAGES ARE
       MERITLESS............................................................................................34

       A.    CoreTel Ordered Verizon South Facilities and Is Liable for
             those Facilities at Verizon South's TELRIC Rates.............................34

       B.    CoreTel Cannot Rely on this Court's Ruling that CoreTel's
             Facilities Bills Violated the Contracts To Avoid Paying Verizon
             for Facilities........................................................................................38

       C.    Verizon Properly Billed CoreTel at Verizon South's Rates for a
             Multiplexer Located in Verizon South's Territory .............................40

       D.    The District Court Correctly Found CoreTel Liable for Both
             Entrance Facility and Transport Charges ...........................................42

       E.    CoreTel Is Liable for the Entire DS3 Entrance Facilities that It
             Ordered and Verizon Provided............................................................44

VI.    THE STATUTE OF LIMITATIONS DOES NOT BAR ANY OF
       VERIZON'S DAMAGES ..........................................................................48

CONCLUSION ...................................................................................................50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

xiv

# TABLE OF AUTHORITIES

Page

**CASES**

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) ............................................16, 18

*Appalachian Power Co. v. Greater Lynchburg Transit Co.*,
    374 S.E.2d 10 (Va. 1988) ......................................................................29, 30

*Barber v. Whirlpool Corp.*, 34 F.3d 1268 (4th Cir. 1994)........................................1

*Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 973-74 (4th Cir. 1997) .................7

*Castro v. Collecto, Inc.*, 634 F.3d 779 (5th Cir. 2011) ............................................49

*Clark v. Scott*, 520 S.E.2d 366 (Va. 1999)..............................................................22

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension
    Trust for S. Cal.*, 508 U.S. 602 (1993) ........................................................22

*Core Communications, Inc. v. Verizon Maryland LLC*,
    744 F.3d 310 (4th Cir. 2014) .................................................................14, 32

*CoreTel Virginia, LLC v. Verizon Virginia LLC*,
    752 F.3d 364 (4th Cir. 2014) .............................................................*passim*

*CoreTel Virginia, LLC v. Verizon Virginia LLC*,
    No. 1:12-cv-741, 2013 WL 1755199 (E.D. Va. Apr. 22, 2013) ..............5, 39

*Covad Communications Co. v. FCC*,
    450 F.3d 528 (D.C. Cir. 2006)........................................................................4

*Estate of Taylor v. Prop. Assocs.*, 448 S.E.2d 413 (Va. 1994)...............................16

*FTC v. Ross*, 743 F.3d 886 (4th Cir. 2014)......................................................*passim*

*First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*,
    693 F.2d 308 (4th Cir. 1982) .......................................................................50

*GTE South, Inc. v. Morrison*, 199 F.3d 733 (4th Cir. 1999)......................................5

*Global Crossing Bandwidth v. Locus TeleCommunication, Inc.*,
    632 F. Supp. 2d 224 (W.D.N.Y. 2009)....................................................49, 50

*Global Crossing Telecomms., Inc. v. nTelos Tel., Inc.*,
    No. 7:11-cv-00503, 2012 WL 4459946 (W.D. Va. June 1, 2012)..........17, 37

*Helton v. AT&T, Inc.*, 709 F.3d 343 (4th Cir. 2013) .........................................16, 18

*Hillman v. IRS*, 263 F.3d 338 (4th Cir. 2001).........................................................27

*Hughes v. Halifax Cnty. Sch. Bd.*, 823 F.2d 832 (4th Cir. 1987) .............................1

*IGEN Int'l, Inc. v. Roche Diagnostics Gmbh*,
    335 F.3d 303 (4th Cir. 2003) ......................................................................12

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*,
    503 F.3d 217 (3d Cir. 2007) ..........................................................................1

*Lowery v. Stovall*, 92 F.3d 219 (4th Cir. 1996) .....................................................26

*MFS Int'l, Inc. v. Int'l Telecom Ltd.*,
    50 F. Supp. 2d 517 (E.D. Va. 1999) .............................................................49

*Malbon v. Pa. Millers Mut. Ins. Co.*, 636 F.2d 936 (4th Cir. 1980) .......................48

*Marcus v. AT&T Corp.*, 938 F. Supp. 1158 (S.D.N.Y. 1996) .................................47

*McKinney v. Bd. of Trs. of Maryland Cmty. Coll.*,
    955 F.2d 924 (4th Cir. 1992) .......................................................................49

*Perry Eng'g Co. Inc. v. AT&T Communications, Inc.*,
    998 F.2d 1010, 1993 WL 264461 (4th Cir. July 13, 1993)..........................37

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012) ..........................26

*Schmidt v. Household Fin. Corp.*, 661 S.E.2d 834 (Va. 2008) ................................26

*Seabulk Offshore Ltd. v. Am. Home Assurance Co.*,
377 F.3d 408 (4th Cir. 2004) ........................................................16

*South Atl. P'ship of Tennessee, LP v. Riese*,
356 F.3d 576 (4th Cir. 2004) ............................................24, 27, 28

*Stamper v. Baskerville*, 724 F.3d 1106 (4th Cir. 1984) ..........................24

*TFWS, Inc. v. Franchot*, 572 F.3d 186 (4th Cir. 2009) .....................16, 18

*United States v. Bell*, 5 F.3d 64 (4th Cir. 1993)....................................26

*United States v. Pileggi*, 703 F.3d 675 (4th Cir. 2013) ..........................27

*Verizon Communications, Inc. v. FCC*, 535 U.S. 467 (2002) ................38

## STATUTES, RULES & REGULATIONS

28 U.S.C.

§ 1291 ..................................................................................1

§ 1961 ................................................................................12

47 U.S.C.

§ 252(e)(2)(A)(ii)..............................................................32

§ 415(a) .................................................................15, 48, 49

§ 415(b)....................................................................15, 48

47 C.F.R. § 69.2(rr)............................................................44

Fed. R. Civ. P. 58 .................................................................1

Fed. R. Evid. 1006 ..........................................................8, 17

Va. Code § 8.01-246(2) ......................................................49

**ADMINISTRATIVE DECISIONS**

Order, *Access Billing Requirements for Joint Service Provision*,
    65 Rad. Reg. 2d 650, 1988 WL 488227
    (FCC Comm. Car. Bur. Oct. 4, 1988) ....................................................37, 38

First Report and Order, *Implementation of the Local Competition*
    *Provisions in the Telecommunications Act of 1996*,
    11 FCC Rcd 15499 (1996)...........................................................................47

Memorandum Opinion and Order, *Application of Verizon Pennsylvania Inc.*
    *et al. for Authorization To Provide In-Region InterLATA Services in*
    *Pennsylvania*, 16 FCC Rcd 17419 (2001) ....................................................46

**OTHER MATERIALS**

Corrected Brief of Verizon, *CoreTel Virginia, LLC v. Verizon Virginia LLC*,
    No. 13-1765 (4th Cir. filed Jan. 17, 2014) (Dkt. No. 41)..............................25

Corrected Reply Brief of CoreTel, *CoreTel Virginia, LLC v. Verizon*
    *Virginia LLC*, No. 13-1765 (4th Cir. filed Jan. 17, 2014)
    (Dkt. No. 42)...............................................................................................26

Restatement (Second) of Contracts § 204 (1979)....................................................37

Verizon Tariff F.C.C. No. 1 ....................................................................................47

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over CoreTel's appeal under 28 U.S.C. §1291 because CoreTel is "appeal[ing] from a final judgment disposing of all the parties' claims." CoreTel Br. 1. There is no merit to CoreTel's suggestion that the district court's order entering that judgment "did not meet the requirements of Fed. R. Civ. P. 58(a)." *Id.* The district court's order consists of a single paragraph describing the disposition of the case, *see* Order at 1 (JA451), and is noted on the docket as entering judgment against CoreTel, *see* Dkt. No. 268, No. 1:12-cv-741 (Dec. 2, 2014) ("ORDERED that judgment is entered") (JA50). That suffices for purposes of Rule 58. *See Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1274 (4th Cir. 1994) (entry of "a document separate from the opinion explaining the judgment" satisfies Rule 58). The district judge's decision to caption that document "as an 'order,' rather than a 'judgment,' does not mean that it fails to satisfy" Rule 58. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 224 (3d Cir. 2007) (internal quotation marks omitted). In all events, by deciding to "proceed[] with a timely appeal" rather than "fil[ing] a motion for entry of judgment," CoreTel has demonstrated that it "view[s] the order as a final judgment" and has forfeited any argument that no final judgment was entered. *Hughes v. Halifax Cnty. Sch. Bd.*, 823 F.2d 832, 835-36 (4th Cir. 1987) (explaining standard).

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly interpreted this Court's remand order.

2.    Whether the district court, after a bench trial, correctly awarded Verizon's damages, including late payment charges, totaling $366,698.69 for CoreTel's breach of contract.

## STATEMENT OF THE CASE

Following this Court's "remand[] to the district court for consideration of . . . Verizon's damages claim" for facilities that Verizon Virginia and Verizon South had provided to CoreTel for years but for which CoreTel paid nothing,[1] the district court did what this Court instructed. The court held a trial on the damages due to Verizon at the rates in the parties' contracts. The court heard witness testimony from both sides, received ample documentary evidence, and issued a well-reasoned, well-supported decision awarding Verizon $366,698.69 in damages. That decision withstands scrutiny under the deferential standard of review applicable to bench trials.

CoreTel now raises objections to virtually every aspect of the district court's decision. Those challenges are the latest iteration of CoreTel's years-long refusal to pay anything at all for facilities it indisputably ordered and received from Verizon. The various challenges are meritless and the Court should affirm the district court's judgment.

### A.    Previous Proceedings

From January 2008 until April 2013, Verizon Virginia and Verizon South provided telecommunications facilities to CoreTel pursuant to contracts known as interconnection agreements. *See CoreTel*, 752 F.3d at 366-69. The substantive

---

[1] *CoreTel Virginia, LLC v. Verizon Virginia LLC*, 752 F.3d 364, 373 (4th Cir. 2014).

3

terms of both contracts are identical, as CoreTel elected to use the pre-existing contract between Verizon Virginia and Cox Virginia Telecom as its contract with both Verizon Virginia and Verizon South.  *See* Letter Adopting Contract with Verizon Virginia at 1-2 (JA610-11); Letter Adopting Contract with Verizon South at 2 (JA618); *see also* Verizon-Cox Agreement ("Agreement") (JA456-609).[2]  But the pricing attachments to the two contracts differ.  *See* Agreement at Ex. A (pricing attachment for Verizon Virginia contract) (JA574-607); Letter Adopting Contract with Verizon South App. A (pricing attachment for Verizon South contract) (JA624-38).

Those contracts required CoreTel to deliver calls to interconnection points on Verizon Virginia's and Verizon South's telephone networks.  *See* Agreement § 4.2.3 (JA469).  The contracts allowed CoreTel to fulfill that duty by obtaining from Verizon Virginia or Verizon South, as appropriate, "an Entrance facility and transport (where applicable) leased from Verizon (and any necessary multiplexing)."  *Id*. § 4.3.1 (JA470).[3]  There is no dispute that CoreTel ordered and

---

[2] References to Cox in that agreement should be understood to refer to CoreTel.

[3] Entrance and transport facilities are the "wires or cables . . .  typically used to connect one network with another."  *CoreTel*, 752 F.3d at 367 n.3.  As relevant here, the entrance facilities and transport were either DS1s or DS3s.  A DS1 is a high-capacity facility that "can carry 24 voice calls simultaneously," while a DS3 "has 28 times the capacity of DS1 facilities."  *Covad Communications Co. v. FCC*, 450 F.3d 528, 535 (D.C. Cir. 2006).  Multiplexers are devices that encode multiple calls so that they can be transmitted along a single line (for example, multiplexing

4

obtained entrance facilities, transport, and multiplexing from Verizon. But the companies disputed whether, under the terms of the contracts, Verizon Virginia and Verizon South could bill CoreTel under § 4.3.3 (JA470) at their state and federal tariff rates or at the lower "TELRIC" rates in the contracts' pricing attachments. *See CoreTel*, 752 F.3d. at 377.[4] Verizon billed CoreTel at its tariffed rates. Although CoreTel contended that Verizon should have billed at the TELRIC rates in the contracts, *see id.*, it refused to pay *anything* for the facilities it obtained, *see* Trial Tr. 21:20-22:1 (JA301).

The district court ruled in favor of Verizon, interpreting the contracts to permit Verizon to charge its tariffed rates for those facilities; the district court also ruled in Verizon's favor on three other issues. *See CoreTel Virginia, LLC v. Verizon Virginia LLC*, No. 1:12-cv-741, 2013 WL 1755199 (E.D. Va. Apr. 22, 2013). To avoid a trial on damages, CoreTel and Verizon reached agreement on the terms of a judgment, as well as a stay pending appeal without the need to post a bond. *See* Joint Mot. for Entry of Final Judgment (JA98-104). The district court

---

several DS1 circuits into a single DS3 circuit) and then separate that multiplexed stream into its component parts (from a single DS3 circuit to multiple DS1 circuits). *See CoreTel*, 752 F.3d at 372 n.9; Trial Tr. 30:23-25 (JA310).

[4] "TELRIC," or total element long-run increment cost rates, are "based on the hypothetical construction and operation of the most efficient local network conceivable." *GTE South, Inc. v. Morrison*, 199 F.3d 733, 737 (4th Cir. 1999). They are normally lower than rates in telephone companies' federal and state tariffs. *See CoreTel*, 752 F.3d at 367 n.2.

entered judgment on the terms agreed to by the parties, *see* Final Judgment (JA96-97), and imposed the terms of the stay, *see* Stay of Judgment Pending Appeal (JA105).

In a 2-1 decision, this Court reversed the district court's ruling on the facilities claim and held that the Verizon Virginia and Verizon South contracts "entitle[d] CoreTel to order entrance facilities for interconnection at TELRIC [rates]." *CoreTel*, 752 F.3d at 372. The Court ordered that "CoreTel was entitled to summary judgment in its favor on both its and Verizon's claims for declaratory relief relating to Verizon's facilities charges" and "remand[ed] to the district court for consideration of CoreTel's claim for injunctive relief and Verizon's damages claim in light of [its] conclusion." *Id.* The Court affirmed the district court's ruling in favor of Verizon on the other three issues. *See id.* at 372-75.

### B.    Remand Proceedings

Shortly after the case was remanded, CoreTel filed a motion seeking entry of a final judgment. *See* JA106-16. CoreTel asserted that, under this Court's ruling, the district court could not award Verizon any damages on its claims for the facilities CoreTel ordered and obtained from Verizon. *See* JA110-11. CoreTel contended that the district court should add up the damages due on the three issues where this Court affirmed the district court (a net judgment of $150,000 in CoreTel's favor), and enter an injunction "permanently enjoining Verizon . . . from

6

terminating the [contracts] or [CoreTel's] access to [Verizon's] services on the basis of the non-payment of Verizon's facilities charges."  JA111, 113-14. Verizon responded that the Court's remand order required the district court to consider Verizon's damages for the facilities CoreTel ordered, *see* JA119-21, and that CoreTel had not demonstrated any entitlement to the overbroad injunction it sought, *see* JA121-23.[5]

Following a hearing on CoreTel's motion at which it rejected CoreTel's claim that this Court's decision precluded it from awarding damages to Verizon, *see* July 8, 2014 Hr'g Tr. (JA128-58), the district court sought briefing from both parties regarding the damages due for Verizon's facilities claim, *see id*. at 28:1-29:12 (JA155-56).  After further briefing and a second hearing, *see* July 18, 2014 Hr'g Tr. (JA257-75), the district court decided that a trial was necessary to determine what damages CoreTel owed Verizon on the facilities claim, *see id*. at 15:17-17:23 (JA271-73).

## C.    The Trial

On August 21, 2014, the district court held a one-day bench trial.  Verizon called two witnesses:  Jonathan P. Beene — Verizon's manager for complex billing, *see* Trial Tr. 15:7-15 (JA295) — as a direct witness, and Peter D'Amico —

---

[5] During subsequent proceedings, CoreTel abandoned its request for injunctive relief.  *See* Mem. Op. at 1 (JA441); *see also* July 8, 2014 Hr'g Tr. 16:9-15 (JA143).  CoreTel has not briefed this issue and has therefore waived it.  *See Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 973-74 (4th Cir. 1997).

a Verizon employee responsible for interconnection, *see id*. at 137:20-34 (JA417)
— as a rebuttal witness.  CoreTel called Bret Mingo — CoreTel's president, *see id*.
at 80:18-19 (JA360) — as its sole witness.

Verizon's damages case began with the monthly invoices and customer
service records that Verizon had sent to CoreTel on CoreTel's four billing accounts
from January 2008 to April 2013.  *See id*. at 22:2-8, 25:10-15 (JA302, 305).
CoreTel cross-designated Verizon's four exhibits containing those invoices and
customer service records as its own evidence and they were admitted into
evidence.  *See id*. at 25:14-15 (JA305).

Verizon's invoices and customer service records contained detailed
information about the specific facilities that Verizon provided to CoreTel,
including where the facilities started and stopped, *see id*. at 22:22-25, 23:16-20
(JA302-03); the distance those facilities traveled, *see id*. at 24:18-24 (JA304);
which Verizon company (Verizon Virginia or Verizon South) provided them, *see
id*. at 27:19-24 (JA307); and the "Universal Service Order Codes" ("USOCs")
identifying each type of facility that CoreTel ordered, *see id*. at 19:16-19, 28:2-6
(JA299, 308).

Verizon introduced into evidence a spreadsheet that summarized the
voluminous information contained in the invoices and customer service records.
*See* Defense Exhibit 14 (JA865-99); *see also* Fed. R. Evid. 1006.  Verizon also

introduced a table linking the USOCs on those customer service records and the

corresponding TELRIC rates in the pricing attachments to the contracts. *See*

Defense Exhibit 13 (JA864); *see*, *e.g.*, Trial Tr. 24:9-23, 30:13-20 (JA304, 310).

Verizon's summary spreadsheet also calculated the amount due at the TELRIC

rates for each facility CoreTel had ordered. *See* Defense Exhibit 14 (JA865-99).

Finally, Verizon introduced evidence that the total amount due for all the

facilities at the TELRIC rates since January 2008 was $227,974.22, *see* Trial Tr.

33:10-12 (JA313); Defense Exhibit 15 (JA900-01), and that CoreTel had not paid

any of this amount, *see* Trial Tr. 21:20-22:1 (JA301-02). Verizon further

introduced evidence that, as of trial, CoreTel owed late payment charges totaling of

$131,885.25, which were growing at the monthly rate of $3,419.61 at the 1.5

percent per month simple interest rate permitted under the contracts. *See id*. at

33:21-34:6 (JA313-14); *see also* Defense Exhibit 15 (JA901).

CoreTel, in contrast, asserted that it owed no more than $71,432.09. *See*

Plaintiff Exhibit 22 (JA910). CoreTel also contended that it owed no late payment

charges. *See* Trial Tr. 122:4-7 (JA402).

### D.    The District Court's Order

The district court ruled in favor of Verizon. *See* Mem. Op. (JA441-50). The

district court accepted Verizon's evidence that "[t]he pricing for each facility

[ordered by CoreTel] can be determined by matching the USOC . . . with the

9

schedule contained in the Interconnection Agreement[s'] pricing attachment[s]."
*Id.* at 3 (JA443).  This methodology, the court determined, demonstrated that
Verizon was entitled to $227,974.22 in damages for the facilities provided to
CoreTel and an additional $138,724.47 in late charge payments, *see id.* at 3-4, 9
(JA443-44, 449).[6]

The district court rejected each of CoreTel's challenges to Verizon's
damages evidence.  The court dismissed CoreTel's argument that it could not be
billed for ordering Verizon South facilities, observing that CoreTel "ordered
facilities . . . located in Verizon South's service territory" and that "nothing in the
Verizon Virginia [contract] gave CoreTel the right to order Verizon South
facilities; this right arose solely from the Verizon South [contract]."  Mem. Op. at
5-6 (JA445-46).  The court also found that Verizon "properly apportioned" charges
between Verizon Virginia and Verizon South for facilities that crossed the
boundary between the two companies' territories by using the "billing
percentages" reported in the National Exchange Carrier Association No. 4 tariff
("NECA 4 tariff").  *Id.* at 6 (JA446).

---

[6] At trial, Verizon's damages evidence included late payment charges
totaling $131,885.25 based on calculations through July 2014.  *See* Defense
Exhibit 15 (JA901).  The district court added two additional months of late
payment charges at the same 1.5 percent monthly rate ($3,419.61 a month) to reach
its awarded amount of $138,724.47.  *See* Mem. Op. at 9 (JA449).

The district court also rejected CoreTel's attempts to reduce Verizon's damages. The district court dispensed with CoreTel's argument that Verizon had improperly billed it at Verizon South's contract rates for use of a multiplexer in Great Bridge, Virginia, finding "the multiplexer was at all times located in Verizon South's service territory and should have been billed at Verizon South's TELRIC rate." *Id*. at 7 (JA447). The district court also rejected CoreTel's contention that Verizon had improperly added transport facilities to CoreTel's orders for entrance facilities for four circuits. *See id*. at 4-5 (JA444-45). The court explained that in each case "the entrance facility [wa]s only the section between [CoreTel's] designated premise and the nearby [Verizon] switch serving that location; the additional distance to the end of the circuit was transport." *Id*. at 5 (JA445). The district court also found CoreTel's claim that it had been improperly charged in full for DS3 entrance facilities was inconsistent with the invoices, which showed that "CoreTel received all of the multiplexers to which the . . . facilities connected" and thus proved that the entrance facilities also "were entirely dedicated to CoreTel's use." *Id*. at 7-8 (JA447-48). Finally, the court determined that Verizon properly applied monthly late payment charges of 1.5 percent to CoreTel's past due amounts. *See id*. at 9 (JA449).[7]

---

[7] CoreTel notes in its factual statement (at 25) that the district court permitted Verizon to charge CoreTel for certain circuits after CoreTel sought to disconnect them. *See* Mem. Op. at 8-9 (JA448-49). CoreTel, however, never

11

The district court entered judgment in favor of Verizon. *See* Order at 1 (JA451). As a result of the court's judgment, CoreTel owes Verizon a net of $216,698.69. That amount is the total of the $366,698.69 awarded by the district court on unpaid facilities bills plus late payment charges ($227,974.22 plus $138,724.47), *see id.*; plus the $100,000 awarded to Verizon and less the $250,000 awarded to CoreTel on the affirmed parts of the earlier judgment, *see* Final Judgment at 1-2 (JA96-97). Consistent with the terms of the agreed-upon stay pending appeal, Verizon has satisfied part of the judgment by applying amounts it was permitted to withhold on CoreTel's reciprocal compensation bills to Verizon since May 2013. *See* Proposed Stay of Judgment Pending Appeal and Terms of Stipulated Stay (JA103-04) & Stay of Judgment Pending Appeal (JA105). CoreTel has neither paid nor bonded the net judgment in Verizon's favor, which continues to accrue post-judgment interest under 28 U.S.C. § 1961.

## SUMMARY OF THE ARGUMENT

**I.** Verizon exhaustively proved its damages at trial. Using the invoices and customer service records that CoreTel cross-designated as its own evidence, Verizon provided proof of each of the facilities that CoreTel ordered and Verizon provided, as well as of the TELRIC rate in the relevant contract applicable to each

---

briefs this issue further and so it is waived. *See IGEN Int'l, Inc. v. Roche Diagnostics Gmbh*, 335 F.3d 303, 308-09 (4th Cir. 2003) ("Failure to present or argue assignments of error in opening appellate briefs constitutes a waiver of those issues.").

facility. CoreTel was unable to identify any facilities on the invoices that it did not order or receive, or any errors in Verizon's summary of that voluminous evidence, Verizon's identification of the applicable TELRIC rates, or Verizon's damages and late payment charge computations. The district court correctly accepted Verizon's evidence and awarded Verizon the full amount of damages it sought at trial.

**II.** The district court correctly rejected CoreTel's claim that this Court's prior decision precluded Verizon from recovering any damages. This Court "remand[ed] to the district court for consideration of . . . Verizon's damages claim." *CoreTel*, 752 F.3d at 372. As the district court recognized, that remand order would have been meaningless if this Court had held that Verizon was precluded from recovering damages at the contract rates. In all events, CoreTel ignores that Verizon's claim has always been one for breach of the contracts. This Court's conclusion that the contracts did not permit Verizon to recover its tariffed rates did not prevent Verizon from recovering the rates that the Court held are due under the contracts and that CoreTel had persistently refused to pay.

**III.** The district court correctly awarded the late payment charges Verizon sought. Because Verizon's bills were for facilities that CoreTel ordered under the contracts, CoreTel was required to pay all undisputed amounts timely, and to pay late payment charges on amounts due, but not timely paid. CoreTel's decision to pay nothing at all, in breach of its obligation to pay undisputed amounts, left it

13

liable for late payment charges on the full amount it owes. Moreover, as the

district court found, the contracts permit Verizon to select the late payment charge,

up to a rate of 1.5 percent per month (the rate Verizon chose). CoreTel's belated

efforts to rely on Virginia law to invalidate the late payment charge provision are

foreclosed by this Court's decision in *Core Communications, Inc. v. Verizon

Maryland LLC*, 744 F.3d 310 (4th Cir. 2014).

    **IV.**    CoreTel's various attempts to reduce Verizon's damages are

unpersuasive. *First*, CoreTel's efforts to avoid paying the rates in its contract with

Verizon South ignore that CoreTel's contract with Verizon Virginia is explicitly

limited to Verizon Virginia's service territory, while CoreTel's obligation to

connect to Verizon South's network arises solely under its separate contract with

Verizon South. *Second*, this Court's earlier rejection of CoreTel's effort to charge

Verizon for facilities on CoreTel's side of the interconnection points has no

bearing on Verizon's damages, which are for the facilities CoreTel used to reach

the interconnection points. *Third*, the district court properly found, based on the

evidence presented, that a particular multiplexer was located in Verizon South's

territory and, therefore, Verizon South's contract rates properly applied. *Fourth*,

applying the contract's definition of entrance facilities, the district court correctly

found that the entrance facilities CoreTel obtained from Verizon ended where they

first connect with Verizon's network, and that CoreTel purchased transport to

14

connect that point to the interconnection points located near the Verizon Virginia or Verizon South customers answering the phone. *Fifth*, the district court properly found, based on the evidence presented, that CoreTel had full use of the DS3 entrance facilities that it ordered and Verizon provided, and therefore was required to pay the full contract rate for those facilities.

**V.** Finally, CoreTel's contention that Verizon's damages are partially barred by the two-year statute of limitations in 47 U.S.C. § 415(a) fails for multiple reasons. *First*, CoreTel waived this argument by relying below only on the separate statute of limitations provided in 47 U.S.C. § 415(b). *Second*, at least one other court of appeals and numerous district courts have concluded that § 415(a) does not apply to state law claims brought to collect non-tariffed charges. Instead, the state law breach-of-contract statute of limitations applies, which in Virginia is five years. *Third*, even if § 415(a) were found to apply, it would block only about $81,000 of Verizon's damages, and Verizon would have the right to recover that same amount through its affirmative defense of recoupment.

## ARGUMENT

## I.    STANDARD OF REVIEW

"In a bench trial, [this Court] review[s] the district court's factual findings for clear error and its legal conclusions de novo." *FTC v. Ross*, 743 F.3d 886, 894 (4th Cir. 2014). "'In cases,'" such as this one, "'in which a district court's factual

15

findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference.'" *Id.* (quoting *Helton v. AT&T, Inc.*, 709 F.3d 343, 351 (4th Cir. 2013). With respect to evidence of damages, "when 'there are two permissible views of the evidence [at trial], the [district court's] choice between them cannot be clearly erroneous.'" *TFWS, Inc. v. Franchot*, 572 F.3d 186, 196 (4th Cir. 2009) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). Under Virginia law, "[t]he interpretation of a written contract is a question of law that turns upon a reading of the document itself." *Seabulk Offshore Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004).

## II. THE DISTRICT COURT PROPERLY AWARDED VERIZON $366,698.69 IN DAMAGES

On remand, Verizon was required "to prove the amount of [its] damages with reasonable certainty" and "by a preponderance of the evidence." *Estate of Taylor v. Prop. Assocs.*, 448 S.E.2d 413, 415, 417 (Va. 1994). Verizon's proof at trial easily met this burden and the district court properly accepted Verizon's damages evidence. *See* Mem. Op. at 3-4 (JA443-44).

Verizon's key pieces of evidence were the invoices and customer service records which Verizon provided to CoreTel on a monthly basis from January 2008 until April 2013. *See* Trial Tr. 21:3-25:15 (JA301-05). Invoices and customer

16

service records from certain months are contained in the Joint Appendix.  *See* JA639-713; JA714-52; JA753-863.

Verizon's invoices and customer service records contain all of the necessary information to determine the applicable contract rate for each facility that CoreTel ordered and Verizon provided.  These documents include, among other things, the specific facilities CoreTel ordered and obtained (identified by their USOCs), *see* Trial Tr. 26:9-15 (JA306); which of the two Verizon companies provided the facility (Verizon Virginia or Verizon South); the mileage for transport facilities, and, where transport facilities crossed the boundary between Verizon Virginia's and Verizon South's territories, the billing percentage used to allocate the charges between the two companies, *id.* at 28:7-25 (JA308).[8]  CoreTel cross-designated Verizon's four invoice and customer service record exhibits as its own.  *See* Trial Tr. at 25:14-15 (JA305).

Because the invoices and customer service records are voluminous, Verizon created a spreadsheet that summarized the information contained in those documents.  *See* Defense Exhibit 14 (JA865-99); *see also* Fed. R. Evid. 1006. CoreTel never challenged the accuracy of that summary.  When asked whether he had found "a single line item on [Verizon's] spreadsheet that is not found in the

---

[8] The billing percentages used in the invoices are those publicly disclosed in the NECA 4 tariff which reports the "billing percentage requirements" for various " 'route pairs.' "  *Global Crossing Telecomms., Inc. v. nTelos Tel., Inc.*, No. 7:11-cv-00503, 2012 WL 4459946, at *1 n.3 (W.D. Va. June 1, 2012).

relevant customer service record for that month," CoreTel's witness admitted "no."

Trial Tr. 124:24-125:10 (JA404-05).[9]

The next step in calculating Verizon's damages was "simple" — matching

the facilities Verizon provided to the corresponding TELRIC rates in the contracts.

Trial Tr. at 40:12-25 (JA320).  To do this, Verizon relied on the USOCs

identifying each kind of facility ordered by and provided to CoreTel.  *See id.* at

19:16-19, 28:2-6 (JA299, 308).  These USOCs are defined in a glossary appended

to each customer service record.  *See id.* at 138:24-139:3 (JA418-19).  For

example, the USOC "TYFBX" is defined is defined as an "Entrance Facility

Chan[nel] Term[ination] DS3-Base Rate Primary Prem[ises]."  English Language

Glossary (JA863); *see* Trial Tr. 139:6-9 (JA419).  Other USOCs identify, among

---

[9] Because Defense Exhibit 14 is indisputably a complete and correct summary of the invoices and customer service records, CoreTel's various claims about earlier summaries that Verizon submitted in support of its February 2013 summary judgment motion (the "Floyd Calc.") or with its July 2014, post-remand damages brief (the "Beene Calc. I") are irrelevant.  Verizon's evidence of the facilities CoreTel ordered and Verizon provided was the invoices and customer service records themselves, not the summaries.  Therefore, to the extent the earlier summaries diverged from those underlying documents, they were erroneous and superseded by Verizon's trial evidence.  In all events, when "'a district court's factual findings turn on . . . the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference'" than normal clear-error review.  *Ross*, 743 F.3d at 894 (quoting *Helton*, 709 F.3d at 351).  Given CoreTel's cross-designatoin of Verizon's exhibits containing the invoices and customer service records, the district court's "choice" to credit Verizon's evidence at trial "'cannot be clearly erroneous.'"  *TFWS, Inc.*, 572 F.3d at 196 (quoting *Anderson*, 470 U.S. at 573).

other things, DS1 entrance facilities, DS3 transport, and DS3-to-DS1 multiplexing. *See* English Language Glossary (JA862-63).

Those USOC definitions, in turn, match up with the text of the pricing attachments to the contracts. For instance, the definition for the USOC TYFBX corresponds to a TELRIC rate contained in the pricing attachment to the Verizon Virginia contract for "DS-3 Channel Termination" for "Entrance Facilities." Agreement at Ex. A § A.II.C (JA576); *see* Defense Exhibit 13 (USOC-to-TELRIC Rate Table) (JA864).

Verizon provided a straightforward explanation of how this methodology worked in practice. Figure 1 shows two circuits CoreTel obtained to carry calls from its switch location in Richmond, Virginia — one terminating in the Verizon Virginia wire center in Petersburg, Virginia, the other ending in Verizon South's wire center in Emporia, Virginia. *See* Trial Tr. 29:20-30:3 (JA309-10).

Figure 1:  Defense Exhibit 16 (JA902)



Figure 1 demonstrates exactly how Verizon calculated its damages for the various facilities that comprise each circuit.  First, CoreTel obtained a DS3 entrance facility (1) between CoreTel's Richmond location and the Verizon Virginia wire center in Richmond, at a Verizon Virginia TELRIC rate of $767.44. *See* Trial Tr. 30:13-17 (JA310).  Second, CoreTel obtained a multiplexer (2) to split that DS3 entrance facility into DS1 transport facilities, at a Verizon Virginia TELRIC rate of $185.73.  *See id*. at 30:21-31:3 (JA310-11).  Third, CoreTel obtained a 22-mile DS1 transport facility (3) linking Verizon Virginia's Richmond location to Verizon Virginia's Petersburg location, at a Verizon Virginia TELRIC rate of $35.10.  *See id*. 31:4-7 (JA311).  Fourth, CoreTel obtained a 60-mile DS1

transport facility (4 and 5) linking Verizon Virginia's Richmond location to

Verizon South's Emporia location.  *See id*. at 31:8-21 (JA311).  Because 44

percent of that DS1 transport (26.4 miles) is in Verizon Virginia's territory and 56

percent of that DS1 transport (33.6 miles) is in Verizon South's territory, Verizon

included 44 percent of the Verizon Virginia TELRIC transport rate ($15.44) and 56

percent of the Verizon South TELRIC transport rates ($157.70).  *See id*. at 31:8-

32:6 (JA311-12).[10]

Applying this same methodology to all of the other facilities CoreTel

ordered and Verizon provisioned, it was a matter of "simple math" for to Verizon

calculate the amounts CoreTel owed for each of the facilities on the invoices from

January 2008 through April 2013, an amount that totaled $227,954.22.  Trial Tr.

32:1, 33:10-24 (JA312, 313); *see also* Defense Exhibit 14 (JA865-99) (summary

of Verizon's invoices and customer service records and TELRIC charge for each

facility); Defense Exhibit 15 (JA900-01) (summarizing Verizon's damages

by month).

Because CoreTel never paid *anything* for *any* of the facilities billed on those

invoices, Verizon added late payment charges at the 1.5 percent monthly simple

interest rate permitted by the contracts, for an additional $131,885.25 through July

---

[10] Although the Verizon Virginia contract has a single, flat rate of $35.10 for
DS1 transport, *see* Agreement at Ex. A § II.A (JA575), the Verizon South contract
has a lower flat rate ($20) plus a rate of $4.36 per mile, *see* Letter Adopting
Contract with Verizon South App. A § III (JA629).

2014.  *See* Trial Tr. 32:21-34:13 (JA312-14); *see also* Agreement § 28.8.7

("Charges which are not paid by the due date stated on Verizon's bill shall be

subject to a late payment charge.  The late payment charge shall be an amount

specified by Verizon which shall not exceed a rate of one and one half percent (1

1/12% [sic]) of the overdue amount (including any unpaid previously billed late

payment charges) per month.") (JA547).  The district court then added two

additional months of late payment charges to reach the final damages amount of

$366,698.69.  *See* Mem. Op. at 9 (JA449); Defense Exhibit 15 (JA900-01).

Verizon "produce[d] sufficient evidence to permit the [court] to estimate

[its] damages with reasonable certainty"; indeed, though not required to do so,

Verizon "prov[ed] [its] damages with mathematical precision."  *Clark v. Scott*, 520

S.E.2d 366, 303 (Va. 1999).  Moreover, this same evidence clearly established that

the existence and accuracy of Verizon's damages was "more probable" than not.

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*,

508 U.S. 602, 622 (1993).  The district court was therefore correct to accept

Verizon's trial evidence proving its damages and to award Verizon the full amount

it sought.

## III.    THIS COURT'S REMAND ORDER REQUIRED THE DISTRICT COURT TO DETERMINE THE DAMAGES DUE TO VERIZON

In its previous decision, this Court determined that the Verizon Virginia and

Verizon South contracts "entitle[d] CoreTel to order entrance facilities for

22

interconnection at TELRIC [rates]" and "remand[ed] to the district court for consideration of . . . Verizon's damages claim" against CoreTel for failing to pay for those facilities. *CoreTel*, 752 F.3d at 372. The district court took this Court's order at its word and "consider[ed] . . . Verizon's damages claim." The court took briefing, *see* Dct. Dkt. Nos. 241, 242, 246, 247, & 248 (JA159-256); held a bench trial, *see* Trial Tr. (JA281-440); received post-trial findings of fact and conclusions of law from both parties, *see* Dct. Dkt. Nos. 265 & 266; and then issued a comprehensive opinion that found Verizon's damages calculations to be accurate, *see* Mem. Op. (JA441-50).

CoreTel now argues (at 29-34) that the district court erred because, under the mandate rule's prohibition on the relitigation of issues decided by a higher court, this Court's "finding that Verizon cannot assess tariff-based facilities charges on CoreTel" eliminated "Verizon's tariff-based claim for interconnection facilities," which CoreTel asserts is "the only facilities claim that Verizon argued it had in this case." CoreTel Br. 30, 32. CoreTel's argument fails for several reasons.

### A.    CoreTel Erroneously Conflates Its Liability for Breach of Contract with the Damages Sought for that Claim

CoreTel's argument confuses an issue this Court *did not* consider — CoreTel's liability for breaching its contracts with Verizon Virginia and Verizon South by failing to pay its bills — with the issue this Court actually decided: the rates to be used in calculating the damages CoreTel owes for that breach. *See*

23

*CoreTel*, 752 F.3d at 370 ("We first address Verizon's claims relating to the applicable rates for entrance facilities."). This distinction is obvious in the Court's instructions. The Court held that "CoreTel was entitled to summary judgment in its favor on . . . its . . . claim[] for declaratory relief relating to Verizon's facilities charges" — which asked for a determination of whether tariff or TELRIC rates apply — but "remand[ed] to the district court for consideration of . . . Verizon's damages claim in light of [its] conclusion" that TELRIC rates apply. *Id.* at 372.[11] That remand instruction obviously "left open" the question of what damages are owed to Verizon at the TELRIC rates. *Stamper v. Baskerville*, 724 F.3d 1106, 1108 (4th Cir. 1984); *see South Atl. P'ship of Tennessee, LP v. Riese*, 356 F.3d 576, 584 (4th Cir. 2004) (holding that the mandate rule only "forecloses relitigation of issues expressly or impliedly decided by the appellate court").

CoreTel errs further (at 31-32) by suggesting that Verizon's claim was an all-or-nothing proposition, so that if Verizon could not collect its tariffed rates, CoreTel could use the facilities for free. But Verizon's facilities claim has always been based on CoreTel's "Breach of [the] Interconnection Agreements" by failing to pay for the facilities it ordered and Verizon provided. Am. Countercls. at 25

---

[11] CoreTel itself describes the " 'principal dispute' " not in terms of liability but " 'whether CoreTel agreed to pay Verizon a tariff rate or a lower cost-based rate for lease of Verizon's entrance facilities for the purpose of interconnection.' " CoreTel Br. 5 (quoting *CoreTel*, 752 F.3d at 375 (Niemeyer, J., concurring in part and dissenting in part)).

24

(JA76). Those contracts expressly identified both the TELRIC rates "set forth in th[e] Agreement[s]" and the rates contained in "any applicable Tariff(s)" as possible "rates and charges" for those facilities. Agreement § 4.3.3 (JA470). In the prior proceedings before this Court, Verizon's position was that CoreTel must pay the tariff rates, while CoreTel argued that TELRIC rates applied. *See CoreTel*, 752 F.3d at 369. But Verizon always took the position that CoreTel could not pay *nothing at all* for the facilities it ordered. *See* Verizon's Mem. in Support of Its Mot. for Partial Summ. Judgment at 11 n.13, Dct. Dkt. No. 152 ("CoreTel . . . had the obligation to pay at least the amount that was due at the contract rates CoreTel contends applied."). The fact that this Court agreed with CoreTel that it was entitled to pay TELRIC rates does not extinguish Verizon's breach of contract claim.

Indeed, in its prior briefing before this Court, Verizon emphasized CoreTel's obligation to make at least some kind of payment under the contracts. *See* Corrected Brief of Verizon at 3, *CoreTel Virginia, LLC v. Verizon Virginia, LLC*, No. 13-1765 (4th Cir. filed Jan. 17, 2014) (Dkt. No. 41) ("CoreTel does identify any contract provision that allowed it to pay nothing for Verizon's facilities."). And CoreTel itself acknowledged that it was, at minimum, required to paid those amounts, admitting that it "ordered [the relevant] facilities under the [contracts] at TELRIC rates." Corrected Reply Brief of CoreTel at 4, *CoreTel Virginia, LLC v.*

*Verizon Virginia, LLC*, No. 13-1765 (4th Cir. filed Jan. 17, 2014) (Dkt. No. 42).

CoreTel cannot now play "fast and loose with the courts" and pretend a different

understanding of Verizon's claim or its own obligations. *Lowery v. Stovall*, 92

F.3d 219, 223 (4th Cir. 1996).

### B.    CoreTel's Position is Inconsistent with the Mandate Rule

CoreTel's argument also fails the test of common sense. As the district

court observed, if Verizon were entitled to no damages on its facilities claim,

"[t]hen why did [the Court of Appeals] send it back here for me to calculate

damages for the use of those facilities?" July 8, 2014 Hr'g Tr. 18:3-4 (JA145).

CoreTel offers no response.

Instead, CoreTel's view that it should get for free the facilities it ordered and

Verizon provided for years effectively turns this Court's order into a command

unjustly enriching CoreTel by allowing it to "'retain[] the benefit [of Verizon's

facilities] without paying for [their] value.'" *Rosetta Stone Ltd. v. Google, Inc.*

676 F.3d 144, 166 (4th Cir. 2012) (quoting *Schmidt v. Household Fin. Corp.*, 661

S.E.2d 834, 838 (Va. 2008)). Nothing in this Court's prior decision suggests such

an intent, and the mandate rule rejects such an absurd outcome by requiring district

courts to "implement both the letter and the spirit of the . . . mandate, taking into

account [the Court's] opinion and the circumstances it embrace[d]." *United States*

*v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (citation and internal quotation marks

26

omitted). CoreTel's reading of this Court's order as conferring upon CoreTel an unfair and unjust benefit should be rejected. *Cf. Hillman v. IRS*, 263 F.3d 338, 342 (4th Cir. 2001) (rejecting "absurd" statutory constructions which would produce results inconsistent with "common sense" (citation and internal quotation marks omitted)).

Furthermore, the cases CoreTel cites do not support its argument. CoreTel repeatedly cites without explanation (at 30-32, 34, 46) to *United States v. Pileggi*, 703 F.3d 675 (4th Cir. 2013). That case is inapposite. There, the Court determined that it was a violation of the mandate rule for a district court to revisit the issue of restitution when its previous decision only "vacated" the defendant's sentence and "remand[ed] . . . for resentencing." *Id.* at 678. By contrast, here, the district court considered the very issue this Court remanded: "Verizon's damages." *CoreTel*, 752 F.3d at 372.

*South Atlantic Partnership of Tennessee v. Riese*, 356 F.3d 576 (4th Cir. 2004), which CoreTel cites (at 30-32, 34), is also inapt. In *Riese*, the Court found that the district court's post-remand judgment violated the mandate rule because it reallocated a judgment to the disadvantage of one party when that very issue of allocation was raised for decision in the prior appeal, but the parties that prevailed post-remand had "failed to pursue the allocation . . . issue" in the earlier appeal. 356 F.3d at 585-87. The district court here did not "impermissibly alter[]" the

Court's remand order in such a manner, *id.* at 584, and the notion that Verizon might collect nothing on its breach of contract claim if it could not collect its tariffed rates was never framed for decision in the prior appeal.

### C.    CoreTel's Remaining Arguments Are Meritless

None of CoreTel's remaining contentions salvages its argument that it can pay nothing for the facilities it ordered and Verizon provided.  CoreTel argues (at 31) that the district court "allow[ed] Verizon to amend its claim[] on remand." But, as shown above, Verizon's facilities claim has never changed; it has always been based on CoreTel's "Breach of [the] Interconnection Agreements" by failing to pay for facilities it ordered under those contracts.  Am. Countercls. at 25 (JA76). Thus, contrary to CoreTel's characterization (at 31), Verizon's claim does not arise from "imaginary TELRIC invoices"; it is based on CoreTel's real, and uncontested, breach of the contracts by failing to pay *anything* for the facilities that it ordered and Verizon provided pursuant to those contracts (which recognized that tariffed or TELRIC rates could apply to those facilities).

CoreTel also contends (at 33) that the district court "wip[ed] out" the prior judgment, which included an award of $250,000 in damages to CoreTel on its reciprocal compensation claim, an award of $100,000 to Verizon on another of its claims, and no damages at all to CoreTel on its claim to recover almost $2 million that it billed to Verizon for facilities.  *See* Final Judgment at 1-2 (JA96-97).

CoreTel misreads the district court's order. The court's most recent order, *see* Order at 1 (JA451), simply modifies the earlier judgment with respect to the Verizon's facilities claim, reducing the damages for that claim from $1,040,000 to $366,698.69, including late payment charges, *see* Final Judgment at 1 (JA96), and removing the attendant declaratory relief, *see id.* at 2 (JA97). The rest of that earlier judgment remains in force.[12]

## IV.    THE DISTRICT COURT CORRECTLY INCLUDED LATE PAYMENT CHARGES IN VERIZON'S DAMAGES

CoreTel's contracts with Verizon Virginia and Verizon South contain a term addressing late payments:

> Charges which are not paid by the due date stated on Verizon's bill shall be subject to a late payment charge. The late payment charge shall be an amount specified by Verizon which shall not exceed a rate of one and one half percent (1 1/12% [sic]) of the overdue amount (including any previously billed late payment charges) per month.

Agreement § 28.8.7 (JA547). In its damages calculations, Verizon followed the "plain meaning" of this term, *Appalachian Power Co. v. Greater Lynchburg Transit Co.*, 374 S.E.2d 10, 12 (Va. 1988), and calculated the late payment charges due on the amounts CoreTel owed at the rate of 1.5 percent per month, *see* Trial Tr. 32:21-34:6 (JA312-14).

---

[12] CoreTel additionally argues (at 32) that the district court improperly allowed Verizon to rely on figures in the NECA 4 tariff. That argument is incorrect for the reasons explained below. *See infra* pp. 37-38.

CoreTel now asks this Court (at 34-39) to disregard the straightforward text of the contracts and to circumvent the provisions in those contracts, which CoreTel itself selected. This Court should reject its arguments. *See Appalachian Power*, 374 S.E.2d at 12 ("[T]he language used [in a contract] is to be taken in its ordinary signification. . . . If, when so read, the meaning is plain, the instrument must be given effect accordingly." (citation and internal quotation marks omitted)).

## A.    The Plain Text of the Contracts Defeats CoreTel's Arguments

CoreTel claims (at 35) that, because "the only bills sent by Verizon were access tariff bills which this Court . . . ruled were improper and should not have been paid[,] . . . . there is no valid due date for these bills . . . and no 'late payment charge' is due with respect to those bills." But this Court held only that the contracts "entitl[ed] CoreTel to order entrance facilities for interconnection at TELRIC" rates, *CoreTel*, 752 F.3d at 372, not that CoreTel could pay nothing at all for those facilities.

Furthermore, Verizon's invoices to CoreTel were for "facilities . . . provided []under" the contracts, Agreement § 28.8.1 (JA546) — namely, under § 4.3.1(c) (JA470), which is the provision under which CoreTel ordered the entrance facilities, transport, and multiplexing that Verizon provided. Although CoreTel disputed those invoices, it remained obligated to "pay when due . . . all undisputed amounts," *id.* § 28.8.3 (JA546), and was liable for "a late payment charge" for

30

amounts due that were "not paid by the due date," *id*. § 28.8.7 (JA547 ).  Had
CoreTel paid what it thought it owed at the TELRIC rates, it would have owed late
payment charges only on the difference (if any) between what it paid and what it
should have paid at those rates.  CoreTel's decision to pay nothing renders it
responsible for late payment charges on the entire amount due.[13]

CoreTel also argues (at 34-35) that Verizon's chosen interest rate violates
the text of the contracts.  That is incorrect.  The contracts expressly allow the late
payment charge to be one "specified by Verizon which shall not exceed a rate of
one and one half percent" per month.  Agreement § 28.8.7 (JA547).  Nothing in the
contracts required Verizon to select a lower monthly rate or permitted CoreTel to
insist on a rate lower than the maximum the contracts allow.

CoreTel also claims (at 35-36) that, because Verizon did not include late
payment charges on its monthly invoices, Verizon has waived its rights to these
charges.  But the contracts provide that the "failure or delay of either Party to
enforce" or "require performance of" the contracts' provisions "shall in no way be
construed to be a waiver of such provisions."  Agreement § 28.18 (JA551).  The
anti-waiver provisions in the contracts foreclose CoreTel's argument.

---

[13] CoreTel contends that Verizon cannot claim late payment charges because
it "may not profit from a breach that it caused."  CoreTel Br. 35.  But it was
CoreTel that breached the contracts by failing to pay the undisputed amounts due
when it disputed Verizon's reading of the contracts to permit it to bill at tariff rates.

### B. CoreTel's Reliance Upon Virginia Law to Circumvent the Contracts' Terms Is Foreclosed by Circuit Precedent

CoreTel next contends (at 36-38) that the late payment charges violate a Virginia usury statute prohibiting late payment charges in excess of 5 percent and constitute impermissible liquidated damages under Virginia Law. Both claims fail for the same reason. In *Core Communications, Inc. v. Verizon Maryland LLC*, 744 F.3d 310 (4th Cir. 2014), this Court rejected a similar attempt by a CoreTel affiliate to invalidate a provision in an interconnection agreement on state law grounds. The Court explained that federal law "creates a narrowly defined time and forum for identifying and evaluating any state-level policy that might invalidate part or all" of such a contract, which is when the agreement is presented to the state commission for approval. *Id.* at 323 (citing 47 U.S.C. § 252(e)(2)(A)(ii)). Once that period has passed, "[n]either the [Telecommunications] Act [of 1996] nor any other provision of federal law . . . subjects a State commission-sanctioned [interconnection agreement] to any subsequent attack on the basis of a state law principle." *Id.* Therefore, the time for CoreTel to complain about the late payment charge provision was when it adopted the contracts, not a decade later in this litigation. CoreTel cannot now "seek[] to avoid a key provision of the very agreement . . . that it previously insisted on." *Id.* at 323 n.16.

32

### C.    CoreTel Cannot Use Amounts Due for Reciprocal Compensation To Reduce the Late Payment Charges It Owes

Finally, CoreTel argues (at 38-39) that "Verizon paid itself by withholding reciprocal compensation from CoreTel" thus reducing the principal amount on Verizon's facilities claim and also the late payment charges.  That argument misstates the facts of this case.

The district court entered judgment in the amount of $250,000 on CoreTel's reciprocal compensation claim, a stipulated sum that the parties agreed "*includ[ed] all late payment charges*" due to CoreTel for invoices dated on or before May 15, 2013.  Final Judgment at 1-2 (JA96-97) (emphasis added); Joint Mot. for Entry of Final Judgment at 1 & Ex. 1 (JA98, 101-02).  Because the agreed-upon amount in the prior judgment includes late payment charges, CoreTel cannot now seek to treat the $250,000 as principal that Verizon applied contemporaneously to pay down the amounts that CoreTel owed for the facilities it obtained from Verizon.[14]

With respect to amounts Verizon has withheld since the district court entered the initial judgment, CoreTel agreed as a condition of obtaining a stay pending appeal without posting a bond that Verizon could withhold payment of amounts due on CoreTel's reciprocal compensation invoices to "satisfy in part . . .the

---

[14] CoreTel's position that the $250,000 from the agreed-upon judgment should be applied to the principal of Verizon's facilities claim is inconsistent with its earlier argument (at 33) that the district court's order "wip[ed] out" that same judgment.

33

stipulated *judgment* amount." Proposed Stay of Judgment Pending Appeal and Terms of Stipulated Stay (JA104) (emphasis added). Having agreed that Verizon could apply the withheld reciprocal compensation amounts to satisfy the judgment, CoreTel cannot now argue that this amount was or should have been applied to the principal due on the entrance facilities on a monthly basis.[15]

## V.     CORETEL'S EFFORTS TO REDUCE ITS DAMAGES ARE MERITLESS

CoreTel next makes several arguments to reduce its damages. *See* CoreTel Br. 40-52. None of those arguments is persuasive.

### A.     CoreTel Ordered Verizon South Facilities and Is Liable for those Facilities at Verizon South's TELRIC Rates

**1.** The district court correctly ruled that CoreTel ordered facilities in Verizon South's service territory and was therefore responsible for those orders at the TELRIC rates set forth in the pricing attachment to the Verizon South contract. *See* Mem. Op. at 4-5 (JA445-46). CoreTel disputes this ruling (at 14, 40-45), arguing that it "never directly interconnected with Verizon South." Instead,

---

[15] CoreTel incorrectly asserts (at 39) that "Verizon actually withheld more reciprocal compensation from CoreTel ($342,000) than CoreTel owed Verizon in TELRIC facilities charges ($227,000)." Because the former amount includes the $250,000 judgment in CoreTel's favor, which, in turn, includes late payment charges, CoreTel is comparing apples and oranges when it excludes the late payment charges CoreTel owes for the facilities it obtained from Verizon. Furthermore, CoreTel ignores the additional $100,000 awarded to Verizon based on CoreTel's breaches of its federal and state tariffs. *See* Final Judgment at 1 (JA96).

34

CoreTel contends (at 43) that it was Verizon Virginia "which received [CoreTel's] order[s] and provided the Entrance Facilit[ies] [which] provided the transport to Verizon South." CoreTel's argument lacks factual and legal merit.

CoreTel's contracts with Verizon Virginia and Verizon South make clear that when CoreTel is "the originating Party," it "is responsible for transporting its traffic . . . to the terminating Party's relevant [interconnection points]." Agreement § 4.2.3 (JA469).[16] For calls to Verizon South customers, Verizon South is the "terminating Party[]" and the relevant interconnection points are Verizon South's. Under each contract, CoreTel could fulfill its obligation by means of "an Entrance facility and transport (where applicable) leased from Verizon (and any necessary multiplexing), to the [Verizon interconnection point]." *Id.* § 4.3.1 (JA470). But each contract is limited in scope. The Verizon Virginia contract "covers services in Verizon Virginia's service territory . . . only," Letter Adopting Contract with Verizon Virginia § 1.D (JA611-12), while the Verizon South contract "only covers services in Verizon South's service territory," Letter Adopting Contract with Verizon South § 1.D (JA619). Reading these provisions together makes clear that CoreTel had to use facilities obtained from Verizon South, under the Verizon

---

[16] At those interconnection points, CoreTel's customers' calls would be connected with Verizon's customers' lines and the per minute reciprocal compensation charges would apply. *See* Agreement § 1.37 (JA461); *id.* §§ 1.60, 1.60a (JA464).

South contract, to satisfy its obligation to get its traffic to its interconnection points with Verizon South.

There is no dispute that CoreTel ordered facilities to reach Verizon South's interconnection points. CoreTel conceded at trial that it had interconnection points with Verizon South at three locations in Virginia — in Great Bridge, Emporia, and Warsaw. *See* Trial Tr. 125:14-126:6 (JA405-06). As CoreTel admits in its brief (at 43) and Verizon's trial evidence showed, CoreTel ordered facilities to reach those three locations. *See* Trial Tr. 29:20-30:3 (JA309-10); *see also supra* Fig. 1 (showing circuit from CoreTel-Richmond to Verizon South-Emporia). CoreTel identifies nothing in the Verizon Virginia contract that required Verizon Virginia to provide CoreTel with facilities in Verizon South's territory. In fact, such a result would have been inconsistent with that contract's express limitation to "Verizon Virginia's service territory . . . only." Letter Adopting Contract with Verizon Virginia § 1.D (JA611-12). Only Verizon South could have provided the facilities necessary to deliver CoreTel's traffic to the interconnection points in Verizon South's territory.

**2.** The only question left unanswered by the plain text of the contracts is how Verizon was to allocate the costs of facilities that commenced in Verizon Virginia's territory and ended in Verizon South's territory. As Verizon explained at trial, Verizon's invoices followed the "industry standard methodology" of using

36

the relevant "border interconnection percentage[s]" reported in the NECA 4 tariff

to supply the relevant billing allocations. *See* Trial Tr. 28:13-22 (JA308). That

was a reasonable approach to filling in this missing term. *See* Restatement

(Second) of Contracts § 204 (1979) ("When the parties to a bargain sufficiently

defined to be a contract have not agreed with respect to a term which is essential to

a determination of their rights and duties, a term which is reasonable in the

circumstances is supplied by the court."); *see also Perry Eng'g Co. Inc. v. AT&T

Communications, Inc.*, 998 F.2d 1010, 1993 WL 264461, at *2 (4th Cir. July 13,

1993) (per curiam) (same under Virginia law).

CoreTel's arguments (at 32, 44-45) about the NECA 4 tariff are meritless.

The NECA 4 tariff is not "another tariff-base charge," as CoreTel claims. CoreTel

Br. 32. Rather, it is a publicly reported set of " 'route pairs' and billing percentage

requirements" for facilities that cross the service territories of telecommunications

companies. *Global Crossing*, 2012 WL 4459946, at *1 n.3. Because such cross-

border facilities are commonplace, the FCC has directed "all" local telephone

companies to use "billing percentages as filed in NECA Tariff F.C.C. No. 4" when

multiple local telephone companies jointly provide facilities. Order, *Access Billing

Requirements for Joint Service Provision*, 65 Rad. Reg. 2d 650, 1988 WL 488227,

¶ 92 (FCC Comm. Car. Bur. Oct. 4, 1988) ("*Joint Service Provision Order*"); *see*

Mem. Op. at 6 (JA446). There is nothing improper about relying on these publicly

reported percentages to divide facilities between Verizon Virginia and Verizon South.

Nor is the NECA 4 tariff somehow "inconsistent with the TELRIC methodology," as CoreTel asserts. CoreTel Br. 44 & nn.5-6. CoreTel cites nothing to suggest that facilities billed at TELRIC rates cannot be allocated between multiple local telephone companies.[17] Most importantly, CoreTel offers no alternative method for billing for facilities located in part in Verizon South's territory that is consistent with the contracts' express statements that each applies solely to one Verizon company's territory and not to the other's territory.

## B. CoreTel Cannot Rely on this Court's Ruling that CoreTel's Facilities Bills Violated the Contracts To Avoid Paying Verizon for Facilities

CoreTel also argues (at 41-42) that Verizon's application of the Verizon South rates is inconsistent with this Court's previous rejection of CoreTel's own attempt to collect for facilities it claimed to provide to Verizon. CoreTel's argument misstates the Court's holding and the facts here.

---

[17] *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 490-91 (2002), which CoreTel cites (at 44 n.4), features no discussion of the NECA 4 tariff. And *Joint Service Provision Order*, 1988 WL 488227, ¶ 2, which CoreTel cites (at 44 n.5), discusses using "meet point billing" to "divide ordering, rating, and billing services on a proportional basis, so that each carrier bill[s] under its respective tariff." Nothing in that decision — which predates the Telecommunications Act of 1996 and TELRIC rates by nearly a decade — suggests that the same principles cannot be used to "divide . . . billing" for facilities charged at TELRIC rates.

38

CoreTel's facilities claim was based on its theory that Verizon was "financially responsible for the trunk ports and multiplexing" that Verizon used when delivering calls to CoreTel's network. *CoreTel*, 2013 WL 1755199, at *3. Both this Court and the district court rejected that theory because the facilities CoreTel billed to Verizon were located "on [CoreTel's] side" of the interconnection point, and CoreTel "conced[ed]" that Verizon used its own transport facilities to reach the interconnection point. *CoreTel*, 752 F.3d at 372-73; *see CoreTel*, 2013 WL 1755199, at *3 ("[The Verizon companies] self-provisioned, at their own expense, the facilities that carry their customers' traffic to CoreTel's network . . . . [and the contracts] do[] not authorize CoreTel to charge [for facilities] when the Verizon [companies] . . . provide the entrance facility."). The Court therefore held that CoreTel could not charge for the trunk ports and multiplexing as though Verizon had ordered facilities because they were not "facilit[ies] connecting and, crucially, lying 'between' the interconnecting carrier's premises and the other party's central office." *CoreTel*, 752 F.3d at 373 (quoting Agreement § 1.25 (JA460)); *see id.* ("Verizon's facilities, not CoreTel's, spanned the distance between Verizon's premises and CoreTel's central office.").[18]

---

[18] The Court explained that CoreTel could be compensated for the trunk ports and multiplexers "exclusively under the rubric of reciprocal compensation." *CoreTel*, 752 F.3d at 373.

This Court's rejection of CoreTel's facilities claim has no application to Verizon's entirely different facilities claim. Verizon never used CoreTel's facilities to reach CoreTel's interconnection points. But CoreTel *did* use Verizon South's facilities to reach Verizon South's interconnection points. *See* Trial Tr. 30:13-31:21 (JA310-11). Furthermore, none of the facilities for which the district court awarded damages to Verizon lie on Verizon's side of the interconnection point.

### C.    Verizon Properly Billed CoreTel at Verizon South's Rates for a Multiplexer Located in Verizon South's Territory

 Among the facilities Verizon provided to CoreTel was a multiplexer in Great Bridge, Virginia. *See* Trial Tr. 140:25-141:21 (JA420-21). The evidence is undisputed that Great Bridge has always been located in Verizon South's territory, *see id*. at 125:24-126:2 (JA405-06), and that the multiplexer never moved from Great Bridge, *see id*. at 128:25-129:2, 143:3-4 (JA408-09, 423).

Despite that, from January 2008 until March 2009, Verizon's invoices to CoreTel mistakenly identified that multiplexer as being provided by Verizon Virginia. *See id*. at 141:4-143:9 (JA421-23).[19] Verizon corrected that billing error in April 2009, and from then through April 2013 properly identified the Great Bridge multiplexer as being provided by Verizon South on the invoices. *See id*. at

---

[19] The exchange carrier number on the invoices misidentified Verizon Virginia as the provider during this period. *See* Trial Tr. 143:1-2 (JA423).

141:4-143:9 (JA421-23). Because Verizon's damages at trial were based on the invoices and customer service records, for the months Verizon mistakenly identified the Great Bridge multiplexer as Verizon Virginia equipment, Verizon sought only the lower TELRIC rate for multiplexing found in the Verizon Virginia contract; conversely, Verizon only sought the higher Verizon South TELRIC rates for those months where Verizon's invoices correctly identified the Great Bridge multiplexer as Verizon South equipment. *See* Defense Exhibit 14 (JA865-899).

The district court recognized that "[t]he original billing at Verizon Virginia's . . . rates was improper" and that Verizon had eventually "amend[ed] the billing to correct th[is] mistake." Mem. Op. at 7 (JA447). Because the multiplexer was always Verizon South equipment, the court concluded that Verizon could recover at Verizon South's TELRIC rates for the multiplexer from April 2009 to April 2013. *Id.*

CoreTel contests this ruling (at 45-46), arguing that Verizon Virginia's rates should have applied for the entire period. Yet CoreTel's own witness admitted that the relevant multiplexer was in Great Bridge, *see* Trial Tr. 128:25-129:2 (JA408-09), and that Great Bridge was continuously in Verizon South's territory, *see id.* at 125:24-126:2 (JA405-06). It was therefore entirely proper for Verizon to recover damages for the multiplexer at Verizon South's rates, at least for the period after the initial billing error was corrected. Furthermore, even if there were inconsistent

evidence on this point (and there is not), "the [district court's] weighing of [such] conflicting evidence during a bench trial" is "entitled to even greater deference" than normal clear-error review. *Ross*, 743 F.3d at 894 (citation and internal quotation marks omitted).

### D. The District Court Correctly Found CoreTel Liable for Both Entrance Facility and Transport Charges

Among the facilities that CoreTel ordered were those linking its Ashburn location to a Verizon Virginia switch in Leesburg. *See* Trial Tr. 145:5-146:3 (JA425-26). For that circuit, as shown on the contemporaneous invoices and customer service records, Verizon billed CoreTel for an entrance facility from CoreTel's switch in Ashburn to Verizon's switch located in and serving Ashburn, and then for 7 miles of transport from Verizon's Ashburn switch to the Leesburg switch, which was the interconnection point for calls to Verizon Virginia customers in the Leesburg area. *See id*. at 146:22-147:15 (JA426-27). Verizon therefore assessed a TELRIC charge for the entrance facility (*i.e.*, CoreTel-Ashburn to Verizon-Ashburn) and a TELRIC charge for the transport (*i.e.*, Verizon-Ashburn to Verizon-Leesburg).

As the district court held, this approach was consistent with the contracts, which define an entrance facility as "only the section between the designated premise and the nearby switch serving that location; the additional distance to the end of the circuit [i]s transport." Mem. Op. at 5 (JA445). The district court's

42

ruling follows directly from the terms of the contracts, which define an entrance facility as "the facility between a Party's designated premises and the Central Office serving that designated premises." Agreement § 1.25 (JA460).[20] In the case of the Ashburn-Leesburg circuit, the evidence at trial showed that Verizon's Ashburn switch is the one "serving [CoreTel's] designated premises" in Ashburn. *See* Trial Tr. 146:17-21 (JA426) ("[T]he local . . . serving office . . . [in] Ashburn . . . is a Verizon wire center that serves the [CoreTel] Ashburn location."). CoreTel lacked any contrary evidence for that circuit or any of the others where Verizon similarly was awarded both entrance facility and transport charges in damages. *See*, *e.g.*, *id.* 130:23-131:2 (JA410-11) (Q. "[T]he Verizon switch that would provide . . . service [for Ashburn] is located in Ashburn, Virginia, isn't it? A. I don't know where it is.").

CoreTel argues (at 46-49) that district court erred by not treating the Ashburn-to-Leesburg circuit and three similar circuits as a single entrance facility. But that argument is based on CoreTel's erroneous claim that an "Entrance Facility terminates at an [interconnection point] . . . where CoreTel's trunks connect to Verizon's switch and where switching occurs." CoreTel Br.47. As the district court correctly observed, *see* Mem. Op. at 4-5 (JA444-45), entrance facilities encompass only "the facility between a Party's designated premises *and the*

_____

[20] A "Central Office" is "a local switching system" or the "building in which [such] switching systems" are housed. Agreement § 1.11 (JA458).

43

*Central Office serving that designated premises*," Agreement § 1.25 (JA460)

(emphasis added); any further transport beyond that "serving" central office is

billed separately.  Therefore, when CoreTel ordered a circuit linking, for example,

its location in Ashburn to Verizon's location in Leesburg, it was necessarily

ordering under the contracts *both* an entrance facility and transport, because the

"Central Office serving [CoreTel's] premises" — the end of the entrance facility

— is located in Ashburn, not Leesburg.[21]

### E.    CoreTel Is Liable for the Entire DS3 Entrance Facilities that It Ordered and Verizon Provided

Among the facilities ordered by CoreTel were DS3 entrance facilities that

connected to DS3 multiplexers.  *See* Trial Tr. 30:13-31:3 (JA310-11).  Verizon

Virginia's and Verizon South's tariffs apply different rates to entrance facilities

and multiplexing depending on whether the customer uses those facilities for

"special access" (a point-to-point connection) or "switched access" (a point-to-

multi-point connection).  *See id*. at 139:10-18 (JA419).  When a single customer

uses a DS3 entrance facility and multiplexer for both switched and special access,

Verizon applies a shared use factor (essentially a usage percentage) to apportion

---

[21] CoreTel's complaints about (at 47-49) "serving wire centers" similarly ignore that the contracts specify that the entrance facility runs from CoreTel's switch to the Verizon "Central Office" (or wire center) "serving" CoreTel's premises.  The contracts thus incorporate the same concept of a serving wire center found in tariffs.  *See* 47 C.F.R. § 69.2(rr) (defining "serving wire center" as the "central office designated by [a] telephone company to serve [a] geographic area").

44

the different tariff rates applicable to each of those facilities.  *See id*. at 139:13-18 (JA419).  Verizon's invoices to CoreTel used this shared use factor, and the factors applied to special and switched access use should sum to 100 percent.  *See id.*at 138:14-23, 139:11-140:24 (JA418-20).

In contrast, the contracts do not contain separate TELRIC rates for switched or special access use of entrance facilities and multiplexers.  *See* Agreement at Ex. A § II.C (JA576); Letter Adopting Contract with Verizon South App. A § III (JA629).  Therefore, when it calculated its damages at TELRIC rates, Verizon did not apply a shared use factor.  *See* Trial Tr. 155:20-156:1 (JA435-36).

CoreTel claims (at 52-53) that Verizon should have applied the shared use factor in calculating its damages, contending that it did not have use of the entirety of the DS3 entrance facilities.  Although Verizon's invoices contained only the shared use factor for DS3 entrance facilities used for switched access, without the corresponding shared use factor for special access, the evidence showed that was a billing error on Verizon's part.  *See* Trial Tr. 139:11-140:1, 155:16-156:16 (JA419-20, 435-46).  CoreTel presented no evidence that it either ordered or obtained only part of any DS3 entrance facility.

On the contrary, the evidence at trial showed that CoreTel had full use of the DS3 facilities it ordered.  The DS3 entrance facilities ended in the DS3 multiplexers.  *See id*. at 24:3-8, 30:13-31:3, 140:10-13 (JA304, 310-11, 420); *supra*

45

Fig. 1.  Verizon's invoices included both shared and special use factors summing to 100 percent for those multiplexers.  *See* Trial Tr. 140:2-24 (JA420).  For example, in October 2012, the shared use factors for a particular DS3 multiplexer provided to CoreTel were 57.14 percent for switched access use and 42.86 percent for special access use.  *See id*. at 140:10-21 (JA420) (discussing portion of customer service record at JA694).  That same month, Verizon applied a 57.14 percent shared use factor to the switched access rate for the DS3 entrance facility connected to that multiplexer, but the corresponding special access shared use percentage and rate was missing from the invoice.  *See id*. at 139:13-23 (JA419) (again discussing JA694).  As Verizon's witness persuasively testified, that was a mistake on the invoices — not evidence CoreTel received only part of the DS3 entrance facility.  *See id*. at 139:10-140:01 (JA419-20).[22]  After all, CoreTel received 100 percent of the multiplexer connected to that DS3 entrance facility. *See* Trial Tr. at 140:14-24 (JA420).  The district court therefore correctly accepted Verizon's evidence, *see* Mem. Op. at 7-8 (JA447-48), and that finding, which "turn[ed] on [the court's] assessments of witness credibility[,] . . . [is] entitled to

---

[22] *See* Memorandum Opinion and Order, *Application of Verizon Pennsylvania Inc. et al. for Authorization To Provide In-Region InterLATA Services in Pennsylvania*, 16 FCC Rcd 17419, ¶ 26 n.93 (2001) ("recogniz[ing], as a practical matter, that high-volume, carrier-to-carrier commercial billing cannot always be perfectly accurate").

even greater deference" than standard clear-error review, *Ross*, 743 F.3d at 894 (citation and internal quotation marks omitted).

CoreTel's claim that it received only part of the DS3 entrance facilities not only conflicts with the evidence, but also is based on a misunderstanding of the shared use factor. That term does not refer to the sharing of facilities between CoreTel and Verizon (or CoreTel and anyone else); it refers to a split between *CoreTel's use* of those facilities for switched access and special access. *See*, *e.g.*, Verizon Tariff F.C.C. No. 1, § 6.8.17 ("Shared use occurs when Special Access [S]ervice and Switched Access Service are provided over the same High Capacity service through a common interface.").[23] Therefore, CoreTel's reliance (at 50) on a portion of the FCC's *Local Competition Order*[24] is misplaced, as that order addresses the scenario where two interconnecting telephone companies share the use of a single facility and send traffic over it in both directions, which is not what occurred here. *See Local Competition Order* ¶ 1062.

---

[23] "Because [Verizon's] tariffs are public documents that [Verizon] is required to file with the FCC, the court may take judicial notice of them pursuant to [Federal Rule of Evidence 201]." *Marcus v. AT&T Corp.*, 938 F. Supp. 1158, 1164-65 (S.D.N.Y. 1996).

[24] First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499 (1996) ("*Local Competition Order*").

## VI.   THE STATUTE OF LIMITATIONS DOES NOT BAR ANY OF VERIZON'S DAMAGES

CoreTel's final argument (at 52-53) is that Verizon's damages are partially barred by the two-year statute of limitations in 47 U.S.C. § 415(a).[25]  As a preliminary matter, CoreTel has waived this argument.  Before the district court, CoreTel argued only that the relevant statute of limitations is found in § 415(b).  *See* CoreTel Mem. Regarding Verizon's TELRIC Damages at 8-9 (JA202-03) ("Verizon's claims are subject to the federal statute of limitations set out in § 415(b).").  Even after Verizon pointed out that § 415(b) could not apply here, because that section governs claims by a customer that it has been damaged by a carrier's actions, *see*, *e.g.*, Verizon Opp. to CoreTel's Proposed Damages at 8 (JA241), CoreTel continued to rely exclusively on § 415(b), *see* CoreTel Proposed Findings of Fact at 23, Dct. Dkt. No. 265 (Sept. 19, 2014) (CoreTel arguing that Verizon's claims "are in fact governed by the federal statute of limitations set out in § 415(b)").  "It is elementary that an issue not raised below will not, absent extraordinary circumstances, . . . be considered on appeal."  *Malbon v. Pa. Millers Mut. Ins. Co.*, 636 F.2d 936, 941 (4th Cir. 1980).  No such exceptional circumstances exist here.  CoreTel simply made the mistake of relying on a

---

[25] Although CoreTel cites to § 415 generally, it quotes from § 415(a).  *See* CoreTel Br. 52.

48

provision that self-evidently applies to claims by customers, a mistake it now

tacitly admits by seeking to switch statutory provisions on appeal.

In all events, Verizon's claim to recover amounts due under the contracts is

governed by Virginia's five-year statute of limitations for breach of a written

contract, not 47 U.S.C. § 415(a).  *See* Va. Code § 8.01-246(2).  Although this Court

has never addressed the issue, at least one other circuit has concluded that § 415(a)

does not "preempt state statutes of limitations governing actions brought under

state law to collect non-tariffed charges."  *Castro v. Collecto, Inc.*, 634 F.3d 779,

785 (5th Cir. 2011).  The cases that CoreTel cites echo this holding.  *See MFS*

*Int'l, Inc. v. Int'l Telecom Ltd.*, 50 F. Supp. 2d 517, 520 n.8 (E.D. Va. 1999)

(explaining that "contract or tort claims against telecommunications carriers that

do not implicate a tariff . . . sound in state law" and are not governed by the federal

statute of limitations).[26]

Finally, even if § 415(a) were to apply to Verizon's claims, only about

$81,000 of the amount the district court awarded was due outside that two-year

period.  *See* Defense Exhibit 15 (JA900-01).  Verizon may recover that amount

---

[26] The sole case CoreTel identifies that appears to apply § 415(a) to non-tariffed claims is *Global Crossing Bandwidth v. Locus TeleCommunication, Inc.*, 632 F. Supp. 2d 224 (W.D.N.Y. 2009).  *Global Crossing* did not involve an interconnection agreement and, moreover, the question whether § 415(a) applied to the services at issue in that case was not litigated because the plaintiff "d[id] not appear to dispute that § 415 applies." *Id.* at 246.  In all events, that district court decision is not binding on this court.  *See McKinney v. Bd. of Trs. of Maryland Cmty. Coll.*, 955 F.2d 924, 927 (4th Cir. 1992).

through the affirmative defense of recoupment, which it pled in answer to CoreTel's complaint. *See* Am. Answer to Compl. at 15 (JA66). "Recoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n.1 (4th Cir. 1982). In this case, CoreTel obtained the entrance facilities at issue to fulfill its own obligations under the contracts to deliver its customers' traffic. *See* Agreement § 4.2.3 (JA469). Those same contracts gave rise to CoreTel's reciprocal compensation claim, for which it was awarded $250,000. *See* Verizon's Proposed Damages at 6-7 (JA164-65); Verizon Opp. to CoreTel's Proposed Damages at 8-9 & n.10 (JA241-42). Accordingly, Verizon could recover the amounts that would be barred by the statute of limitations by recouping them from the award to CoreTel. Indeed, CoreTel's own cases recognize that parties like Verizon may recover time-barred damages under a theory of recoupment. *See Global Crossing*, 632 F. Supp. 2d at 247-48 (cited by CoreTel at 52-53).

## CONCLUSION

For the foregoing reasons, the Court should affirm the final judgment in its entirety.

50

Respectfully submitted,

　/s/ *Scott H. Angstreich*
SCOTT H. ANGSTREICH
EDUARDO F. BRUERA
KELLOGG, HUBER, HANSEN, TODD,
　EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
(202) 326-7900
(202) 326-7999 (facsimile)

*Counsel for Defendants-Appellees*

April 3, 2015

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. __15-1008__    Caption: <u>CORETEL VIRGINIA, LLC, v.</u>
<u>VERIZON VIRGINIA LLC, et al.</u>

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    Type-Volume Limitation:  Appellant's Opening Brief, Appellee's Response
Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words
or 1,300 lines.  Appellee's Opening/Response Brief may not exceed 16,500
words or 1,500 lines.  Any Reply or Amicus Brief may not exceed 7,000
words or 650 lines.  Counsel may rely on the word or line count of the word
processing program used to prepare the document.  The word-processing
program must be set to include footnotes in the count.  Line count is used
only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)
or 32(a)(7)(B) because:

☒    this brief contains 11,568 words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses monospaced typeface and contains [_____] lines of
text, excluding the parts of the brief exempted by Fed. R. App. P.
32(a)(7)(B)(iii)

2.    Typeface and Type Style Requirements:  A proportionally spaced typeface
(such as Times New Roman) must include serifs and must be 14-point or
larger.  A monospaced typeface (such as Courier New) must be 12-point or
larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and
the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒    this brief has been prepared in a proportionally spaced typeface using
Microsoft Word in 14 pt. Times New Roman; *or*

☐    this brief has been prepared in a monospaced typeface using
[_____] in [_____].

   /s/ *Scott H. Angstreich*

SCOTT H. ANGSTREICH
EDUARDO F. BRUERA
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
(202) 326-7900
(202) 326-7999 (facsimile)

*Counsel for Defendants-Appellees*

April 3, 2015

## CERTIFICATE OF SERVICE

I certify that, on April 3, 2015, the foregoing document was filed with the Court through the CM/ECF system.  I further certify that, on this date, a true and correct copy of the foregoing document has been served on counsel by overnight mail at the address listed below.

Edward Tolchin
OFFIT KURMAN, PA
8000 Tower Crescent Drive,
Suite 1450
Tysons Corner, VA 22182
(703) 745-1800 (Tel.)
(703) 745-1835 (Fax)
etolchin@offitkurman.com

*Counsel for Plaintiff-Appellant*

  /s/ *Scott H. Angstreich*
Scott H. Angstreich